IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 13, 2021

## STATE OF TENNESSEE v. DEJAVONE LEE WOODS

### Appeal from the Circuit Court for Rutherford County
No. F-78596  Royce Taylor, Judge

_____

### No. M2020-00114-CCA-R3-CD
_____

A jury convicted the Defendant, Dejavone Lee Woods, of attempted voluntary manslaughter and employing a firearm in the attempted commission of a dangerous offense, and he received an effective ten-year sentence. On appeal, the Defendant asserts that the State failed to negate self-defense, that the trial court erred in admitting hearsay evidence, that the trial court erred in admitting testimony about a surveillance video, that the trial court erred in refusing to give an instruction on misdemeanor reckless endangerment, and that he is entitled to cumulative error relief. After a review of the record, we conclude that the Defendant is not entitled to appellate relief and affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Russell N. Perkins (on appeal) and Whitney Raque and William Cain (at trial), Murfreesboro, Tennessee, for the appellant, Dejavone Lee Woods.

Herbert H. Slatery III, Attorney General and Reporter; James Gaylord, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant and the victim, Mr. Dusty Johnson, got into an argument over $15 at a bar, and the Defendant ultimately shot the victim in the face in the parking lot. The Defendant was charged with attempted first degree murder and employing a firearm during the attempt to commit a dangerous felony. The State had video, fingerprint, and DNA evidence establishing that the Defendant was present in the bar, and it presented testimony that the man from the bar identified as the Defendant shot the victim in the parking lot. The Defendant testified that he acted in self-defense, stating that he approached the victim in the parking lot in search of a jack to change his car's tire, that the victim produced a gun, that there was a struggle over the gun, and that the gun discharged during the struggle.

The shooting occurred shortly before 1:00 a.m. on March 31, 2016, outside a bar in Smyrna, Tennessee. The bartender, Ms. Sakille Gordon, had not seen either the victim or the Defendant in the bar prior to the night of the shooting, and the two did not appear to be acquainted. The Defendant, whom she described as a tall, thin, African American man with "fat" dreadlocks, had a beer and some food and chatted with Ms. Gordon. She was able to remember that he had a "long name" that began with a "D," that he lived in Murfreesboro but stayed with his girlfriend near the Smyrna bar, that he was from Indiana, and that his girlfriend had asked him to put his belongings into his car and leave as a result of some information she uncovered on his cell phone. The Defendant and victim began to chat and at one point shared some food.

Shortly before the bar was to close, the Defendant and the victim began to argue about $15. According to Ms. Gordon, the Defendant was "coming at [the victim] like he owed him money" but was not confrontational with anyone else. She likewise did not hear the victim make any derogatory comments toward anyone in the bar. Mr. Deshaun Mobley, a customer at the bar, recalled a "back and forth" between the two and recalled that Ms. Gordon asked them to leave.

Ms. Gordon stated that the argument was not loud or obnoxious but that she asked the two to "take it outside" on three occasions and finally asked them to leave the bar entirely. The Defendant left first. She described the following exchange: "But before he left, he's like, I'm going to ask you one more time. He's like, give me the money you owe me. And [the victim], he was saying, no, I don't owe you anything. And he was like, all right. God bless you." Ms. Gordon testified that the victim was upset about the argument and was "rambling" about being accused of taking money but that he did not appear violent.

Ms. Gordon and Mr. Mobley agreed that the victim appeared intoxicated.  Mr. Mobley stated that the victim's speech was slurred and that he was stumbling.  Mr. Mobley and a few other men in the bar escorted the victim outside, and Mr. Mobley and the bar owner doubted whether they should allow him to drive.  Mr. Mobley recalled that the victim and Defendant were both doing "a little loud mouth talking" outside of the bar and that the victim resisted leaving.  Ms. Gordon likewise testified that the victim was "walking the sidewalk and talking" and that the bar manager went out to tell him to leave.  Mr. Mobley described the victim as "aggressive," clarifying that he meant the victim was aggressive in the language he used and not physically.  Mr. Mobley saw the Defendant pull off in a grey Cadillac CTS, and the car did not appear to have any mechanical issues or a flat tire.  However, while the victim was still sitting in his vehicle, the Defendant's Cadillac pulled back up to the building.  The men outside asked him why he had returned.  The Defendant went to his trunk.  Mr. Mobley testified: "And after that, it was really choppy.  After he got the gloves, I don't know what he did after that point."  Mr. Mobley recalled that he heard a shot and saw the flash of a muzzle.  He testified that he and the others ran inside and locked the door.  He then saw the Defendant "pac[e]" back to his car and leave.

Ms. Gordon, through the front of the building, which was all glass, likewise saw a car pull up to the bar and saw a man who was the same stature as the man who had sat at the bar run over to where the victim was parked.  She heard a pop, and the man ran back to his car and sped off.

The victim, who had been shot in the face, attempted to come back into the bar.  Mr. Mobley stated that a "knucklehead" had opened the door and that the bloody victim walked in but was ushered back out to wait for emergency personnel.  Ms. Gordon described the victim as a "zombie" and stated that she had "never seen anything look so horrible."  The owner of the bar told the victim to go back outside to wait for help.

A surveillance video from the bar was played during the testimony given by Ms. Gordon and by Mr. Mobley.  The video showed the Defendant and victim apparently chatting amicably prior to the dispute, and at one point there appeared to be cash in the victim's hands.  Ms. Gordon identified the point at which the parties were arguing and the Defendant left.  The victim was escorted out soon thereafter.  The video corroborated the testimony that the victim, who staggered at several points in time and nearly fell off his stool, was intoxicated.  Distinguishable on the video were the lights of a vehicle pulling away from the front of the bar after the victim was escorted outside.  Approximately two minutes later, the five or six men who had gone outside with the victim returned to the bar.  The gunshot can be marked by the reaction of the bar patrons, and the video showed Mr. Mobley locking the door.  The video showed a figure pass in

front of the bar, and then it showed the victim, with blood on his face, enter the bar briefly. One of the men pulled on the victim's arm to get him to exit the bar.

On cross-examination, Ms. Gordon agreed that she had previously given a statement to the police in which she said, "I didn't see any of the activity outside after they left. I continued to clean the bar." However, she explained that she meant that she did not see the firing of the gun or the shooter's face. She reiterated that she saw someone matching the Defendant's physique run to the victim's car and back again after the shot. After viewing the video, Mr. Mobley acknowledged that the video reflected he was not, as he had testified, outside at the time of the shooting. However, he reiterated that he saw the flash of the muzzle, noting he was standing in the doorway and that the door and front of the building were made of glass.

Mr. Matthew Wiley, a paramedic, testified that he treated the victim in the parking lot. The victim had lost a large amount of blood, and Mr. Wiley observed two gunshot wounds in his head, which may have been an entrance and exit wound. The victim was in pain, and the injury was life-threatening. The victim acknowledged having consumed alcohol and could not identify his source of pain but stated that a "black male" had shot him. The victim's father testified about the victim's medical condition, including that the victim's head was swollen to twice its normal size and that the bullet traveled close to the victim's brain.

Officers from the Smyrna police department investigated the shooting. Corporal Joshua Johnson found a .380 caliber shell on the sidewalk, which was "quite a distance" from where the victim's car was found. Officer Michael Reed testified that the door to an Asian grocery store had been broken and that it appeared that the victim lost control of the vehicle after the shooting, drove into the grocery store door, and then drove back to the area in front of the bar. Officer Reed testified that all the vehicles in the lot were searched in an effort to locate the weapon, but no weapon was ever found. Corporal Johnson recovered a bullet from the passenger's seat of the victim's vehicle. He also removed latent prints from the area of the bar where the shooter had sat. Ms. Gordon had saved the shooter's beer bottle, and Corporal Johnson swabbed it for DNA. Corporal Johnson acknowledged he did not attempt to retrieve fingerprints from the bullet casing, testifying that heat and pressure would generally destroy any fingerprints.

Detective Stephen Hannah, II, confirmed that a search for the gun was conducted but was fruitless. He issued a media release with a photograph from the bar surveillance footage, and he developed the Defendant as a suspect. From a database, he obtained a photograph of the Defendant with dreadlocks similar to those described by the witnesses as having been worn by the shooter. A silver Cadillac CTS was registered to the Defendant. Detective Hannah attempted to locate the Defendant at his home the day after

the shooting, but neighbors had not seen him or his vehicle in a few days. Detective Hannah identified the Defendant's girlfriend, who lived approximately a mile from the bar. Neither the Defendant nor his vehicle were at her house, and she did not give law enforcement any information to assist them in finding him.

Detective Hannah reviewed the bar surveillance and attempted to locate other surveillance footage. He testified that a gas station's cameras did not cover the area of the shooting but that a vapor shop nearby had footage similar to the footage from the bar. He clarified that the bar's camera was facing out of the front windows and was angled to the left, that the vapor shop was to the left of the bar, and that the vapor shop's camera was facing out of the windows and angled to the right. Consequently, both videos covered approximately the same area and neither recorded the actual shooting. Detective Hannah testified that he spent several hours trying to download the vapor shop's video and that he downloaded an app on his phone to try to transfer it. He also sought help from a colleague. He was unable to download the video, and when he returned "a couple" of weeks later, the video had been overwritten by the store. He acknowledged that the video would have been helpful to the jury. He testified that the video depicted the driver of the Cadillac retrieving something from the trunk and driving away. Shortly thereafter, the Cadillac's driver walked towards the victim's vehicle, which was off-screen, and then walked away from the victim's vehicle.

On June 18, 2016, the Defendant was detained by police in Milwaukee, Wisconsin, because his physique and clothing matched the description of someone who had committed a crime. Although law enforcement determined the Defendant was not implicated in that crime, he was arrested for the shooting in the Smyrna parking lot after giving his name to law enforcement. The Defendant's hair had been closely cropped and was no longer in dreadlocks.

The Defendant was brought to Tennessee, and his DNA was collected for analysis. Special Agent Laura Boos, a forensic scientist at the Tennessee Bureau of Investigation ("TBI") testified that the DNA from the outer rim of the beer bottle collected from the bar matched the Defendant's DNA. DNA from the inner rim of the bottle was limited and inconclusive with respect to the Defendant, although it excluded the victim as a contributor. Special Agent Dabney Kirk, an expert in latent print identification with the TBI, analyzed two palm prints which had been collected by Corporal Johnson from the bar and identified both as the Defendant's right palm.

In July 2016, the Defendant made a telephone call from jail using his social security number and identifying himself as "D.J." He told his girlfriend that the victim was very intoxicated and would not credibly be able to testify that he remembered what happened. He noted the hospital would have the victim's blood alcohol content. He also

stated that he would research "some other stuff" because "[t]here's some loopholes" and said that seeing the evidence at the preliminary hearing would "open up a lot of different things." Detective Hannah testified that he listened to over one hundred calls and that the Defendant never said that the victim brandished a gun at him or that the Defendant's car had a flat tire. He acknowledged that the call played at trial was the most incriminating call he heard and that the Defendant never admitted to having committed any criminal offense in the jail calls.

The Defendant testified that he worked twelve-hour shifts as a forklift operator, and that his protective equipment included gloves. On March 30, 2016, he finished work at around 10:00 p.m., put air into his tire, which was low, and went to his girlfriend's home, where he frequently stayed. His girlfriend had seen something she did not like on his cell phone earlier that day, and she had the Defendant pack his belongings into his car and leave. The Defendant told her that he would leave Tennessee if they broke up. The Defendant ended up in the Smyrna bar close to his girlfriend's home, where he engaged in casual conversation with bar patrons and with the victim after the victim arrived.

The Defendant testified that he asked the victim if the victim had any "green," or marijuana. In response, the victim lifted his shirt to show a gun. The surveillance video corroborates that the victim and Defendant were speaking and that the victim then leaned backwards on his stool while lifting his shirt to expose his abdomen. The Defendant thought the victim might be an off-duty police officer at that time. The victim went to the bathroom, and when he returned, he "started tripping" about $15 he had left at the bar. The Defendant told the victim that he was comfortable financially and would not steal $15. The Defendant testified that the victim was argumentative with others in the bar as well and that the victim was intoxicated.

Prior to exiting, the Defendant got up and showed the victim his pockets. The Defendant told the victim, "God bless you," and left. The Defendant said that he saw that his tire was flat and that he opened his trunk to get his tools and his work gloves to change the tire. The victim exited and was "fussing" and "putting up a ruckus." The Defendant yelled to the victim that he was drunk and should go home. The Defendant realized that the handle for his jack was missing and drove off as shown in the video. However, he was worried about damaging his car and returned to try to borrow a jack. He asked the men in front of the bar for one, but they did not respond and went inside. The Defendant testified he did not believe his argument with the victim had been intense, and so he went to the victim's car to try to borrow a jack. The victim was looking at his cell phone and may have been startled because the victim immediately "lifted the gun up." The Defendant was afraid that if he moved away, the victim would simply shoot him, so he grabbed the gun. The victim continued to hold onto the gun, and they "tussled" until it went off. The Defendant left the gun with the victim. He ran back to

his car, trying to see if he was shot. He was not sure if either he or the victim had been injured when he left the scene, and he drove to his girlfriend's house.

The Defendant testified that in the morning, he borrowed a jack from the neighbors and changed his tire. Although his girlfriend had allowed him to stay that night, she did not want to remain his girlfriend and he decided to leave Tennessee for this reason. He said he purchased a bus ticket to Wisconsin because the drive would have been too long. The Defendant testified he was afraid no one would believe his story because the victim had been injured and because the victim was white and he was African American. He explained his changed appearance by saying he cut his hair for the summer. He explained that he gave his real identity to Milwaukee police because he wanted to see if the rumor that there was a warrant for his arrest was true.

On cross examination, the Defendant elaborated on his actions after the shooting by explaining he went to work the day after the shooting but left work early to pack. He stayed at his own house, where a friend had also been living, and he borrowed a telephone to make arrangements. He said that he got a ride to the bus station and left his car key in his apartment for a friend to retrieve. When pressed, he stated he did not know what happened to his car and that he thought it might have been repossessed.

The Defendant orally moved for acquittal at the close of the State's proof, asserting as one ground the fact that the testimony regarding the video from the vapor shop should have been excluded under *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). The trial court denied the motion but noted it would "give a duty to preserve evidence charge to the jury." The State opposed the instruction on the grounds that the evidence had not been in the State's possession. The trial court revisited the issue the following day and ultimately concluded the charge would not be supported under caselaw.

The Defendant made an oral request for an instruction on the lesser included offense of misdemeanor reckless endangerment. The trial court refused, ruling that the facts of the case did not support the instruction. The jury was charged in count one with attempted first degree murder and the lesser included offenses of attempted second degree murder and attempted voluntary manslaughter. During deliberations, the jury sent a question to the trial court asking if they could "have the option of involuntary manslaughter and a definition." The trial court instructed the jury that they were restricted to the charges given in writing and referred them to the instruction on deliberation and order of consideration. The jury convicted the Defendant of the lesser included offense of attempted voluntary manslaughter in count 1 and of employment of a firearm in the attempt to commit a dangerous felony in count 2.

At the sentencing hearing, the victim testified that he and the Defendant argued about $15 that the victim had left under a coaster. In the parking lot, the Defendant came up and attempted to rob him, saying "die, motherf***er" when the victim would not give him money. The victim testified regarding his injuries and the effect the shooting had on him. He did not testify at trial because the prosecutor did not want the jury to hear evidence regarding his prior convictions for burglary, theft, and perjury. He denied being armed, noting he was a convicted felon. He acknowledged inconsistencies in his testimony and acknowledged that, at the time of the hearing, he was charged with offenses in which the victim was one of his sons. The Defendant's mother testified that the Defendant had always been kind and forgiving and that his family would support him. The trial court sentenced the Defendant as a Range I offender to four years for attempted voluntary manslaughter and to six years for employing a firearm during the attempt to commit a dangerous felony, to be served consecutively. The Defendant moved for a new trial on several grounds, including the sufficiency of the evidence; the admission of Mr. Wiley's testimony that the victim said he was shot by a "black male"; errors related to the vapor shop video including admission of Detective Hannah's testimony, refusal to give a *Ferguson* instruction, and "potential violations of the constitutional right to cross-examination"; the trial court's denial of the instruction on misdemeanor reckless endangerment; and cumulative error. The trial court denied the motion for a new trial.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant asserts that the State failed to negate self-defense beyond a reasonable doubt. This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on

appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As charged, criminal attempt required the State to show that the Defendant, acting with the culpability required for the offense, acted with intent to cause a result that is an element of the offense and believed the conduct would cause the result without further conduct on his part. T.C.A. § 39-12-101(a)(2). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). The phrase "irrational manner" encompasses "a broad consideration of mental states produced by adequate provocation." T.C.A. § 39-13-211, Sentencing Comm'n Cmt. The question of whether the provocation was adequate falls to the province of the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); *see State v. Khaliq Ra-El*, No. W2013-01130-CCA-R3-CD, 2014 WL 3511038, at *5 (Tenn. Crim. App. July 11, 2014) (upholding an attempted voluntary manslaughter conviction when the defendant shot the victim after accusing her of theft).

To convict the Defendant of employing a firearm during the attempt to commit a dangerous felony, the State had to show that the Defendant intentionally, knowingly, or recklessly employed a firearm during the attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(2). Voluntary manslaughter is a dangerous felony. T.C.A. § 39-17-1324(i)(1)(C).

The Defendant does not contest that the elements of attempted voluntary manslaughter or employing a firearm during the attempt to commit a dangerous felony were met, but he argues that the evidence was insufficient to refute self-defense. According to the Defendant, because his testimony that the victim was brandishing a weapon at him was not refuted by witnesses, the State failed to negate self-defense as a matter of law.

That the accused was acting in self-defense is a complete defense to an offense. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). Under Tennessee Code Annotated section 39-11-611:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is

immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611 (Supp. 2012).

The burden of negating self-defense lies with the State. T.C.A. § 39-11-201(a)(3). The defendant's conduct and mental state must meet an objective standard of reasonableness in order for the homicide to be justified. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Self-defense "is not limited to the exact moment of the assault that may be considered in connection with the entirety of the events leading to the assault." *Ivy*, 868 S.W.2d at 727. Whether a defendant was acting in self-defense is a question of fact for the jury. *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The Defendant is entitled to relief if he can show that the evidence of self-defense in the record "raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *Clifton*, 880 S.W.2d at 743.

Evaluating the sufficiency of the evidence in the light most favorable to the prosecution, the proof established that the Defendant and the victim argued over $15. The Defendant testified that the victim accused him of stealing $15, while Ms. Gordon testified that the Defendant accused the victim of the theft. The employees and patrons of the bar asked the two to leave, and they did so separately. Although the Defendant testified that the victim was armed in the bar, that the weapon reappeared when the victim brandished it in the parking lot, and that he struggled over the gun out of fear of imminent bodily injury, the jury was not required to credit this testimony. There was also evidence from which the jury could have inferred that the victim was not armed and was not the aggressor and that the Defendant accordingly did not reasonably fear imminent death or serious bodily injury. The proof showed that the victim was in his car preparing to leave and that the Defendant had driven away from the bar when the Defendant returned and retrieved something from his trunk. The Defendant's act of returning to the bar, retrieving an object from his trunk, and approaching the victim after the confrontation had ended supports an inference that the victim was not the aggressor. The Defendant's explanation for his actions, that he wanted to borrow a jack for his flat tire, is refuted by

witness testimony that there was nothing wrong with the Defendant's car. The jury could have rejected the Defendant's explanation that, to seek help for car trouble, he approached the very person with whom he had been arguing, despite the presence of numerous other people nearby. The jury could also have discredited the Defendant's testimony that the gun was the victim's and that he left the gun in the victim's possession because the proof established that no gun was ever found despite a search of all the vehicles in the parking lot. After the shooting, the Defendant ran to his car and did not contact authorities. He immediately fled town, abandoning his home, his girlfriend, his vehicle, and his dreadlocks. There was evidence from which the jury could have chosen to discredit the Defendant's testimony that the victim was armed and that the Defendant's acts were justified as self-defense. Accordingly, we conclude that there was sufficient evidence to negate the Defendant's theory of self-defense.

## II. Hearsay Testimony

The Defendant asserts that the trial court erred in admitting Mr. Wiley's testimony that the victim told him he was shot by a "black male" because the testimony constituted hearsay. The State asserts that the statement was properly admitted or that its admission was harmless. We conclude that the admission of the statement was harmless error.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. A trial court's findings of fact or credibility determinations underlying a decision to admit or exclude hearsay are binding on an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Id.* We review for abuse of discretion the determination to exclude otherwise admissible hearsay based on relevance or on a balancing of probative value and prejudice under Tennessee Rule of Evidence 403. *Id.*

The State relies on an exception to the hearsay rule which makes admissible "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." Tenn. R. Evid. 803(4). The rationale behind making such statements admissible is that such statements are "'presumptively trustworthy because a patient is strongly motivated to speak the truth in order to receive proper diagnosis and treatment'" and because a statement deemed sufficiently reliable to form the basis of diagnosis and treatment "'is also sufficiently reliable for consideration by a court of law.'" *State v. Spratt*, 31 S.W.3d 587, 600 (Tenn. Crim. App. 2000) (quoting *State v.*

*Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997)). Such statements must be "reasonably pertinent to diagnosis and treatment" to be admissible. *Stinnett*, 958 S.W.2d at 331. Although a child's statement identifying a perpetrator of a crime as a member of the household may be pertinent to diagnosis and treatment, *State v. Howard*, 504 S.W.3d 260, 280 (Tenn. 2016), the name or identity of a perpetrator is generally not considered reasonably pertinent to diagnosis and treatment, *State v. Livingston*, 907 S.W.2d 392, 396 (Tenn. 1995). Accordingly, while the statement about the nature of the injury being a gunshot wound was admissible, the description of the shooter did not fall under the hearsay exception.

However, in this case, there was no dispute that the gunshot wound was the result of the Defendant, who is African Amercian, grabbing the gun. The Defendant's own testimony was that the victim was shot when the victim "lift[ed] up the gun and I grabbed it." The identity or physical description of the Defendant was not at issue; instead, the parties disputed whether the shooting was intentional or occurred accidentally in the course of a struggle over the gun. Accordingly, the admission of the victim's hearsay statement that the shooter was a "black male" was harmless because the Defendant did not contest his involvement with the shooting. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

Insofar as the Defendant asserts that the inclusion of the statement into evidence violated his right to confrontation because the victim never testified, *see* U.S. Const. amend. VI; Tenn. Const. art. I, § 9, we agree with the State that this issue has been waived because the Defendant did not challenge the testimony on this basis at trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

### III. Surveillance Video

The Defendant asserts the trial court erred in admitting Detective Hannah's testimony regarding the vapor shop surveillance video without providing a jury instruction pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), or that it erred in not dismissing the charges. The State responds that the issue is waived and that there was no *Ferguson* violation because the video was never in the possession of the State. We conclude that the State had no duty to preserve the evidence because the evidence was never in its possession.

The Defendant moved for judgment of acquittal and for dismissal based in part on the issue that the vapor shop video had not been preserved. The trial court denied the motions but indicated its willingness to give a jury instruction on preservation of evidence. The State, however, objected that the instruction was inapplicable because the State was never in possession of the evidence. After conducting research, the trial court concluded the next day that the State had no duty to preserve the video because it was not in the State's possession. Although the State's brief now relies on the fact that the defense did not raise the issue again at the charge conference, the trial court had already ruled on the jury instruction issue. In any event, the Defendant's argument on appeal encompasses not only the request for jury instructions but also the claim that the trial court should have dismissed the charges based on the *Ferguson* issue. This issue was preserved at trial and in the motion for a new trial.

A trial court's decision to dismiss an indictment based on a determination that the State's destruction of evidence has violated the defendant's due process rights is reviewed de novo. *State v. Merriman*, 410 S.W.3d 779, 790 (Tenn. 2013). The trial court's findings of fact in determining the violation are conclusive on appeal unless the evidence preponderates otherwise. *Id.* at 791. If this court concludes upon its de novo review that there was a due process violation, then we review the trial court's choice of remedy under an abuse of discretion standard. *Id.*

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution guarantee the right to a fair trial. Part of the right to a fair trial is the "constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). When the State's actions result in the loss or destruction of potentially exculpatory evidence, the court must determine whether a trial conducted without that evidence would be fundamentally fair. *Id*. at 914. As a preliminary step in evaluating the fundamental fairness of a trial held without the lost or destroyed evidence, the court must determine whether the State had a duty to preserve the evidence. *Id.* at 917. Generally, the duty to preserve extends to constitutionally material evidence subject to discovery under Tennessee Rule of Criminal Procedure 16 or other law. *Id.* If the court finds that the destroyed evidence was constitutionally material or potentially exculpatory, then it must determine the degree of negligence in the destruction, the significance of the destroyed evidence in light of its probative value and the reliability of secondary or substitute evidence which remains available, and the sufficiency of the other evidence. *Merriman*, 410 S.W.3d at 785.

However, the prosecution is not required to disclose to the defense "'information which is not possessed by or under the control of the prosecution or another

- 13 -

governmental agency.'" *State v. Yevette Somerville*, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *5 (Tenn. Crim. App. Feb. 11, 2002) (citing *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)).  In *State v. Ladarron S. Gaines*, this court held that the trial court properly admitted testimony regarding destroyed video surveillance which was in the possession of a private citizen because "the video was privately owned and never in the State's possession or control."  No. M2013-02272-CCA-R3-CD, 2014 WL 4179123, at *8 (Tenn. Crim. App. Aug. 22, 2014) (noting also that failure to collect the video before it was overwritten was simple negligence, that there was other evidence pertinent to identity, and that the other evidence of guilt was strong); *see also State v. Mario Hubbard*, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *7 (Tenn. Crim. App. June 7, 2017) (the State had no duty to preserve a surveillance video in the possession of car dealership when officers simply failed to collect it); *Yevette Somerville*, 2002 WL 1482730, at *5 (the State had no duty to preserve or disclose a video surveillance tape which was in the possession of a retailer and was destroyed prior to law enforcement's collecting it).  Moreover, the State is not under a duty to investigate in any particular way, and evidence that has not been collected, "for purposes of the *Ferguson* analysis[,] … do[es] not exist."  *State v. Brock*, 327 S.W.3d 645, 699 (Tenn. Crim. App. 2009) (noting that the State had no duty to collect fingerprint evidence or a bloody footprint).  Pursuant to the cases cited above, there was no due process violation under *Ferguson*, and the trial court did not err in refusing to dismiss the charges.

### IV. Reckless Endangerment Instruction

The Defendant next asserts that he was entitled to an instruction on misdemeanor reckless endangerment.  The State responds that the Defendant has waived the issue by failing to request the instruction in writing.  We conclude that the issue is waived.

Under Tennessee Code Annotated section 40-18-110,

> (a) When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment.  However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense.  In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence.  The trial judge shall also determine whether the evidence,

viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

    (b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge.

    (c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

T.C.A. § 40-18-110.

The record does not reveal any written request for the instruction as required by statute. Accordingly, under the plain terms of the statute, the Defendant was not entitled to a charge on the lesser included offense. T.C.A. § 40-18-110(b). Pursuant to the statute, the failure to request the instruction in writing also cannot be presented as a ground for relief on appeal. T.C.A. § 40-18-110(c). The Tennessee Supreme Court affirmed that "if a defendant fails to request an instruction on a lesser-included offense in writing at trial, the issue will be waived for purposes of plenary appellate review and cannot be cited as error in a motion for a new trial or on appeal." *State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006). A failure to instruct on lesser included offenses is nonstructural constitutional error and "is subject to waiver for purposes of plenary appellate review when the issue is not timely raised and properly preserved." *Id.* at 230.

The Defendant cites to *State v. Rush* for the proposition that misdemeanor reckless endangerment is a lesser included offense of attempted second degree murder. *State v. Rush*, 50 S.W.3d 424, 432 (Tenn. 2001), *as amended* (July 25, 2001). He also cites to *Rush* for the proposition that the trial court was required to instruct on the lesser included offense even without a request and that the failure to do so was reversible error. *Id.* at 431-32. However, we note that *Rush* relied on a previous version of Tennessee Code Annotated section 40-18-110(a) which provided that the trial court had "a duty to charge the jury as to each offense 'without any request on the part of the defendant to do so.'" *Id.* at 427-28 (citing T.C.A. § 40-18-110 (1999)). This is no longer the law. *See* T.C.A. § 40-18-110 (2001). Additionally, the reversal in *Rush* was prompted by the determination that the offense of which the defendant stood convicted did not constitute a lesser

included offense of the charged crime and by the necessity to determine whether, given the acquittal on the greater offense, there were any remaining crime with which the defendant could be charged. *Rush*, 50 S.W.3d at 432.

We conclude that under the plain terms of Tennessee Code Annotated section 40-18-110, the issue is waived. *See Page*, 184 S.W.3d at 229. The Defendant does not request plain error review, and we accordingly decline to undertake it.

### V. Cumulative Error Relief

The Defendant requests cumulative error relief. The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). The doctrine of cumulative error only applies when there has been more than one error committed during trial. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). We conclude that the Defendant is not entitled to cumulative error relief.

### CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE